*Arkansas Teachers Ret. Sys., et al. v. Goldman Sachs Grp., Inc., et al.*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

——————————

August Term 2016

(Argued: March 15, 2017    Decided: January 12, 2018)

Docket No. 16-250

ARKANSAS TEACHERS RETIREMENT SYSTEM, WEST
VIRGINIA INVESTMENT MANAGEMENT BOARD,
PLUMBERS AND PIPEFITTERS PENSION GROUP, ILENE
RICHMAN, individually and on behalf of all others
similarly situated, PABLO ELIZONDO, HOWARD
SORKIN, individually and on behalf of all others similarly
situated, TIVKA BOCHNER, EHSAN AFSHANI, LOUIS
GOLD, THOMAS DRAFT, individually and on behalf of all
others similarly situated,

*Plaintiffs-Appellees*,

v.

GOLDMAN SACHS GROUP, INC., LLOYD C.
BLANKFEIN, DAVID A. VINIAR, GARY D. COHN,

*Defendants-Appellants*.*

——————————

* The Clerk of the Court is respectfully directed to amend the
caption.

Before:

    CABRANES, WESLEY, *Circuit Judges*, SESSIONS, *District Judge*.[*]

    Defendants-Appellants Goldman Sachs Group, Inc., Lloyd Blankfein, David A. Viniar, and Gary D. Cohn, appeal from a September 24, 2015 order of the United States District Court for the Southern District of New York (Crotty, *J.*), certifying a class of plaintiffs who purchased shares of common stock in Goldman Sachs Group, Inc., between 2007 and 2010. Plaintiffs alleged that defendants made material misstatements about Goldman's efforts to avoid conflicts of interest, and that those misstatements caused the value of their shares to decline. To establish the predominance of class-wide issues under Federal Rule of Civil Procedure 23(b)(3), plaintiffs invoked the rebuttable presumption of reliance established in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). In light of this Court's recent pronouncement that defendants seeking to rebut the *Basic* presumption must do so by a preponderance of the evidence, *see Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017), and for the additional reasons stated herein, we VACATE the District Court's order and REMAND for further proceedings consistent with this opinion.

————————————

[*] Judge William K. Sessions III, of the United States District Court for the District of Vermont, sitting by designation.

THOMAS C. GOLDSTEIN, Goldstein & Russell, P.C., Bethesda, MD (Susan K. Alexander, Andrew Love, Robbins Geller Rudman & Dowd LLP, San Francisco, CA; Thomas A. Dubbs, James W. Johnson, Michael H. Rogers, Labaton Sucharow LLP, New York, NY, *on the brief*) *for Plaintiffs-Appellees*.

ROBERT J. GIUFFRA, JR., (Richard H. Klapper, David M.J. Rein, *on the brief*), Sullivan & Cromwell LLP, New York, NY, *for Defendants-Appellants*.

Max W. Berger, Salvatore J. Graziano, Bernstein Litowitz Berger & Grossman LLP, New York, NY; Blair Nicholas, Bernstein Litowitz Berger & Grossmann LLP, San Diego, CA; Robert D. Klausner, Klausner, Kaufman, Jensen & Levinson, Plantation, FL, *for Amicus Curiae National Conference on Public Employee Retirement Systems in support of Plaintiffs-Appellees*.

Rachel S. Bloomekatz, Deepak Gupta, Gupta Wessler PLLC, Washington, D.C.; Mark I. Gross, Jeremy A. Lieberman, Pomerantz LLP, New York, NY; Robert D. Klausner, Klausner, Kaufman, Jensen & Levinson, Plantation, FL, *for Amicus Curiae Louisiana Sheriffs' Pension and Relief Fund in support of Plaintiffs-Appellees*.

Daniel P. Chiplock, Lieff Cabraser Heimann & Bernstein, LLP, New York, NY, *for Amicus Curiae National Association of Shareholder and Consumer Attorneys in support of Plaintiffs-Appellees*.

Jeffrey W. Golan, Barrack, Rodos & Bacine, Philadelphia, PA; James A. Feldman, Washington, D.C., *for Amici Curiae Evidence Scholars in support of Plaintiffs-Appellees*.

Barbara A. Jones, AARP Foundation Litigation, Pasadena, CA, *for Amici Curiae AARP and AARP Foundation in support of Plaintiffs-Appellees*.

David Kessler, Kessler Topaz Meltzer & Check, LLP, Radnor, PA; Ernest A. Young, Apex, NC, *for Amici Curiae Procedure Scholars in support of Plaintiffs-Appellees*.

Robert V. Prongay, Glancy Prongay & Murray LLP, Los Angeles, CA, *for Amici Curiae Securities Law Professors in support of Plaintiffs-Appellees*.

George T. Conway III, Wachtell, Lipton, Rosen & Katz, New York, NY, *for Amici Curiae Former SEC Officials and Law Professors in support of Defendants-Appellants*.

Charles E. Davidow, Marc Falcone, Robyn Tarnofsky, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, D.C.; Ira D. Hammerman, Kevin M. Carroll, Securities Industry & Financial Markets Association, Washington, D.C., *for Amicus Curiae Securities Industry & Financial Markets Association in support of Defendants-Appellants*.

Lewis J. Liman, Cleary Gottlieb Steen & Hamilton LLP, New York, NY; Kate Comerford Todd, U.S. Chamber Litigation Center, Inc., Washington, D.C., *for Amicus Curiae Chamber of Commerce of the United States of America in support of Defendants-Appellants*.

––––––––––––––

WESLEY, *Circuit Judge*:

Investors in a securities fraud class action traditionally have a problem proving that "questions of law or fact

common to class members predominate over . . . questions affecting only individual members" under Federal Rule of Civil Procedure 23(b)(3). The presumption established in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), addressed that problem by allowing courts to presume that the price of stock traded in an efficient market reflects all public, material information—including misrepresentations—and that investors rely on the integrity of the market price when they choose to buy or sell stock. *Basic* also established, however, that defendants may rebut the presumption, and therefore defeat class certification, by showing the misrepresentations did not actually affect the price of the stock. The question presented in this case is what defendants must do to meet that burden.

In light of this Court's recent pronouncement that defendants bear the burden of persuasion to rebut the *Basic* presumption by a preponderance of the evidence, s*ee Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017), and for the additional reasons stated herein, we VACATE the September 24, 2015 Order of the United States District Court for the Southern District of New York (Crotty, *J.*) granting plaintiff's motion for class certification and REMAND for further proceedings consistent with this opinion.

## BACKGROUND

Plaintiffs-appellees acquired shares of common stock in The Goldman Sachs Group, Inc. ("Goldman") between February 5, 2007 and June 10, 2010. In July 2011, they commenced a securities fraud action in the District Court against Goldman and several of its directors (collectively,

"defendants"), for violating section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

## I. Plaintiffs' Allegations of Fraud

In their consolidated class action complaint, plaintiffs alleged that defendants made material misstatements about Goldman's efforts to avoid conflicts of interest, causing the value of their stock to decline.[1] Specifically, they alleged that defendants made the following statements in Goldman's Form 10-K filings and Annual Report, as well as in shareholder conference calls:

> Our reputation is one of our most important assets. As we have expanded the scope of our business and our client base, we increasingly have to address potential conflicts of interest, including situations where our services to a particular client or our own proprietary investments or other interests conflict, or are perceived to conflict, with the interest of another client . . . .

---

[1] Plaintiffs also alleged defendants failed to disclose Goldman's receipt of "Wells Notices," which are sent by the SEC in order to inform a firm that the SEC intends to bring an enforcement action against it. The District Court dismissed that cause of action and it is not at issue in this appeal. *See Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 269, 275 (S.D.N.Y. 2012).

We have extensive procedures and controls that are designed to identify and address conflicts of interest. . . .

Our clients' interests always come first. Our experience shows that if we serve our clients well, our own success will follow. . . .

We are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us. Our continued success depends upon unswerving adherence to this standard. . . .

Most importantly, and the basic reason for our success, is our extraordinary focus on our clients. . . .

Integrity and honesty are at the heart of our business. . . .

Joint App'x 81–87.

Plaintiffs claimed that these statements about Goldman's efforts to avoid conflicts of interest were false and misleading because Goldman acted in direct conflict with the interests of its clients in at least four collateralized debt obligation ("CDO") transactions involving subprime mortgages between 2006 and 2007, most notably the Abacus

2007 AC-1 ("Abacus") transaction involving hedge-fund client Paulson & Co. Plaintiffs alleged that Goldman permitted Paulson, its client, to play an active role in the asset selection process for Abacus, without revealing to institutional investors that Paulson held the sole short position and thus chose particularly risky mortgages that it hoped "would perform poorly or fail." Plaintiffs claimed that Goldman's role in Abacus, which ultimately resulted in a $550 million settlement with the SEC, "allow[ed] a favored client to benefit at the expense of Goldman's other clients," creating a conflict of interest at odds with the company's public statements.

The complaint asserted that Goldman created similar conflicts of interest in three other CDO transactions involving subprime mortgages: Hudson Mezzanine Funding 2006-1 ("Hudson"), Anderson Mezzanine Funding 2007-1 ("Anderson"), and Timberwolf I ("Timberwolf"). Goldman allegedly contributed equity to the portfolios in those transactions and told investors it was "aligned" with them, while simultaneously holding substantial short positions opposite their investments.

Although plaintiffs invested in Goldman—but not any of the CDOs described above—they claimed Goldman's conflicted roles in the transactions revealed that the company did not have "extensive procedures and controls . . . designed to identify and address conflicts of interest" and that it was not "dedicated to complying fully with the letter and spirit of the laws," as its public statements had suggested.

Plaintiffs alleged that news of government enforcement actions against Goldman on three occasions in mid-2010 revealed the falsity of defendants' statements and caused the company's share prices to decline. On April 16, 2010, the SEC filed a securities fraud action against Goldman and one of its employees regarding the Abacus transaction, for failing to disclose to potential investors that Paulson played a significant role in the asset selection process. Following the announcement, the company's stock price declined 13% from $184.27 to $160.70 per share on April 16, 2010. On April 30, 2010, the company's share price dropped another 9% from $160.24 to $145.20 after the Wall Street Journal reported that Goldman was under investigation by the Department of Justice for its purported role in the CDOs. And on June 10, 2010, the press reported that the SEC was investigating Goldman's conduct in the Hudson CDO, which resulted in a further 2% decline in the price of Goldman stock.[2]

According to plaintiffs, these three "corrective disclosures"[3] revealed to the market the falsity of

---

[2] The Complaint identified a fourth corrective disclosure on April 26, 2010, but plaintiffs have abandoned any reliance on that disclosure, which did not contain news of government enforcement activities and caused no statistically significant movement in the price of Goldman's stock.

[3] A "corrective disclosure" is an announcement or series of announcements that reveals to the market the falsity of a prior statement. *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005).

defendants' statements regarding Goldman's efforts to avoid conflicts of interest. Plaintiffs claimed that, on April 16, April 30, and June 10, 2010, the market learned for the first time that Goldman had created "clear conflicts of interest with its own clients" by "intentionally packag[ing] and s[elling] . . . securities that were designed to fail, while at the same time reaping billions for itself or its favored clients by taking massive short positions" in the same transactions. Plaintiffs alleged that defendants made the misstatements with the intent to defraud Goldman's shareholders, and that they lost, in total, over $13 billion as a result of defendants' fraud.

Defendants initially moved to dismiss the complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), arguing the alleged misstatements were too general and vague to be actionable as a matter of law. The District Court denied defendants' motion, holding that plaintiffs sufficiently pleaded all six elements of a securities fraud action.[4] *See Richman,* 868 F. Supp. 2d at 271–72, 279. The District Court subsequently denied defendants' motions for reconsideration and interlocutory appeal. *In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10 Civ. 3461, 2014 WL 2815571, at *6 (S.D.N.Y. June 23, 2014); *In re Goldman Sachs Grp., Inc. Sec.*

---

[4] Those elements are "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

*Litig.*, No. 10 Civ. 3461, 2014 WL 5002090, at *3 (S.D.N.Y. Oct. 7, 2014).

## II. Plaintiffs' Motion for Class Certification

Plaintiffs then moved to certify a class consisting of "[a]ll persons or entities who, between February 5, 2007 and June 10, 2010, purchased or otherwise acquired the common stock of The Goldman Sachs Group, Inc. . . . and were damaged thereby." Plaintiffs argued (and defendants did not dispute) that they satisfied the requirements for class certification under Federal Rule of Civil Procedure 23(a): The class was sufficiently numerous, there were common issues of law or fact, the claims of the representative parties were typical of the claims of the class, and the representative parties would fairly and adequately protect the interests of the class.

Plaintiffs also argued they satisfied Rule 23(b)(3) because common issues of law or fact predominated over issues affecting only individual members and a class action was the superior method of adjudicating the controversy. *See* FED. R. CIV. P. 23(b)(3). To establish the predominance of class-wide issues with respect to the reliance element of their securities fraud claim, plaintiffs argued they were entitled to a presumption that all class members relied on defendants' misstatements in choosing to buy Goldman stock. The presumption derives from *Basic*, 485 U.S. 224, and is based on the theory "that the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Id.* at 246. If plaintiffs in a securities fraud class action

establish certain prerequisites—namely, that defendants' misstatements were publicly known, their shares traded in an efficient market, and plaintiffs purchased the shares at the market price after the misstatements were made but before the truth was revealed—the court presumes the market price reflected the misstatements and that all class members relied on that price when they chose to buy or sell shares. *See Halliburton Co. v. Erica P. John Fund, Inc.* (*Halliburton II*), 134 S. Ct. 2398, 2413 (2014).

Defendants opposed class certification by attempting to rebut the *Basic* presumption. They presented evidence in the form of declarations and sworn affidavits that Goldman stock experienced no price increase on the dates the statements were made, and no price decrease on 34 occasions before 2010 when the press reported Goldman's conflicts of interest in the Abacus, Hudson, Anderson, and Timberwolf transactions.[5] For example, as early as December 6, 2007, the

---

[5] Both plaintiffs' and defendants' experts used "event studies" to determine whether an event or news report caused a statistically significant change in the price of Goldman's stock. An event study isolates the stock price movement attributable to a company (as opposed to market-wide or industry-wide movements) and then examines whether the price movement on a given date is outside the range of typical random stock price fluctuations observed for that stock. If the isolated stock price movement falls outside the range of typical random stock price fluctuations, it is statistically significant. If the stock price movement is indistinguishable from random price fluctuations, it cannot be attributed to company-specific information announced on the event date. *See* Mark L. Mitchell & Jeffry M. Netter, *The Role of Financial Economics in*

Financial Times ran a story suggesting that "Goldman's Glory May [B]e Short-lived," due to numerous accusations that it "behave[ed] unethically and perhaps [broke] the law" in taking massive short positions in the U.S. housing market. The article questioned Goldman's ability to "manage conflicts," noting that "Goldman ha[d] been more aggressive than any other bank" in "advis[ing] a company on a transaction, financ[ing] it and invest[ing] its own money." Approximately one week later, the Dow Jones Business News reported that Goldman had been subpoenaed for its role in various CDO transactions that presented a "massive conflict of interest with major liabilities." Defendants' expert presented evidence that Goldman's stock experienced no price decline in response to these or similar reports about Goldman's conflicts in the CDOs.

Because the market did not react to defendants' misstatements on the dates they were made or on the dates defendants claim the truth about Goldman's conflicts was revealed, defendants argued the misstatements did not affect the price of Goldman stock and plaintiffs could not have relied on them in choosing to buy shares at that price.[6]

---

*Securities Fraud Cases: Applications at the Securities & Exchange Commission*, 49 BUS. LAW. 545, 556–69 (1994).

[6] Defendants challenged the materiality of the misstatements again in their opposition to the motion for class certification. Although materiality is "an essential predicate of the fraud-on-the-market theory," it is common to the class and does not bear on the predominance requirement of Rule 23(b)(3). *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466–67 (2013).

Without holding an evidentiary hearing or oral argument, the District Court rejected defendants' arguments and certified the class. *See In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10 Civ. 3461, 2015 WL 5613150 (S.D.N.Y. Sept. 24, 2015). It concluded plaintiffs met all four elements of Rule 23(a) and established predominance under Rule 23(b)(3) by invoking the *Basic* presumption of reliance. *Id.* at *3, 7. Although the court acknowledged that defendants may rebut the *Basic* presumption by a "preponderance of the evidence," *id.* at *4 n.3, it held that defendants failed to do so in this case because they "d[id] not provide conclusive evidence that no link exists between the price decline [of Goldman stock] and the misrepresentation[s]." *Id.* at *7.

The District Court rejected defendants' evidence that the price of Goldman stock did not increase on the dates the misstatements were made, because it determined they could have served to maintain an already inflated stock price. *See id.* at *6. It also rejected defendants' evidence concerning a lack of price impact when the news reported Goldman's conflicts in the CDOs, because, in its view, defendants' evidence was either "an inappropriate truth on the market defense" or an argument for materiality that the court "w[ould] not consider" at the class certification stage. *Id.* at *6 (internal quotation marks omitted). Even if it were to consider the evidence, the court held it did not rebut the *Basic* presumption of reliance because it "failed to conclusively

Therefore, the District Court correctly held that plaintiffs need not prove the materiality of defendants' misstatements at the class certification stage, and we do not consider it on appeal.

14

sever th[e] link" between defendants' statements and the market price of Goldman stock. *Id.* at *7. Accordingly, the court held plaintiffs were entitled to the presumption of reliance and certified the class. *Id.* We granted defendants' petition for leave to appeal pursuant to Federal Rule of Civil Procedure 23(f).

## DISCUSSION

No one disputes that plaintiffs satisfy the four requirements of Rule 23(a). The battle is joined over whether plaintiffs can meet the predominance requirement of Rule 23(b)(3), with respect to the reliance element of their securities fraud claim.[7]

### I. Rule 23(b)(3) and the *Basic* Presumption of Reliance

Reliance in a 10b-5 action ensures "a proper connection between a defendant's misrepresentation and a plaintiff's injury." *Erica P. John Fund, Inc. v. Halliburton Co.* (*Halliburton I*), 563 U.S. 804, 810 (2011) (internal quotation

---

[7] The burden of proving compliance with Rule 23 rests with the party moving for class certification. *See Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013). On appeal, we review the District Court's grant of class certification for an abuse of discretion, and the legal conclusions underlying that decision *de novo*. *See Barclays*, 875 F.3d at 92. When a case involves the application of legal standards, we look at whether the District Court's application "falls within the range of permissible decisions." *Id.*

15

marks omitted). "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was [personally] aware of a company's statement" and purchased shares based on it. *Id*. But requiring that kind of proof in a securities fraud class action "place[s] an unnecessarily unrealistic evidentiary burden on the Rule 10b-5 plaintiff who has traded on an impersonal market." *Basic*, 485 U.S. at 245. If every plaintiff had to prove she relied on a misrepresentation in choosing to buy stock, it would effectively prevent investors from proceeding as a class; individual issues of reliance would overwhelm common ones and make certification under Rule 23(b)(3) inappropriate in every case.

The Supreme Court in *Basic* sought to alleviate that concern by permitting securities fraud plaintiffs to satisfy Rule 23(b)(3) by invoking a rebuttable presumption of reliance. The presumption derives from the "fraud-on-the-market" theory, which holds that "the market price of shares traded on [a] well-developed market[] reflects all publicly available information, and, hence, any material misrepresentations." *Id.* at 246. As the Court in *Basic* explained:

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock

16

> even if the purchasers do not directly rely
> on the misstatements.

*Id.* at 241–42 (internal quotation marks omitted).

"If a market is generally efficient in incorporating publicly available information into a security's market price," the fraud-on-the-market theory assumes investors rely on that price as an "unbiased assessment of the security's value in light of all public information," including any material misrepresentations. *Amgen*, 568 U.S. at 462.

*Basic* endorsed the fraud-on-the-market theory and applied it to class action lawsuits for securities fraud. It held that if plaintiff-investors prove that a company's misstatement was public, the company's stock traded in an efficient market, and the plaintiffs purchased the stock after the misstatement was made but before the truth was revealed, they are entitled to a presumption that the misstatement affected the stock price and that they purchased stock in reliance on the integrity of that price. *Basic*, 485 U.S. at 247, 248 n.27. Under the *Basic* presumption, individual class members need not prove they actually relied upon (or even knew about) the misstatement giving rise to their claim; "anyone who buys or sells the stock at the market price may be considered to have relied on th[e] misstatement[]." *Halliburton II*, 134 S. Ct. at 2405.

The *Basic* presumption does not eliminate the predominance requirement of Rule 23(b)(3) or the reliance element of a 10b-5 action for fraud. It simply provides an alternative means of satisfying those requirements, enabling class action litigation of securities fraud claims where none

previously could have survived. *See id.* at 2414. Accordingly, defendants opposing class certification may rebut the presumption of reliance "through evidence that the misrepresentation did not in fact affect the stock price." *Id.*

The "fundamental premise" underlying the fraud-on-the-market theory is "that an investor presumptively relies on a misrepresentation" that "was reflected in the market price at the time of his transaction." *Halliburton I*, 563 U.S. at 813. If defendants "sever[] the link" between the misrepresentation and the market price—by showing, for example, that the misrepresentation was not public, the shares did not trade in an efficient market, or "the misrepresentation in fact did not lead to a distortion of price"—both the theory and the presumption collapse. *Basic*, 485 U.S. at 248. "[T]he basis for finding that the fraud had been transmitted through market price would be gone," and plaintiffs are no longer entitled to the presumption. *Id.* Instead, each plaintiff must prove she *actually* relied on defendants' misrepresentations when choosing to buy or sell stock, which dooms the predominance of class-wide issues under Rule 23(b)(3) and defeats class certification. *See Halliburton II*, 134 S. Ct. at 2416.

## II. Rebuttal of the *Basic* Presumption

The parties agree that plaintiffs established the preliminary elements to invoke the *Basic* presumption of reliance: defendants' misrepresentations were public, Goldman's shares traded in an efficient market, and the putative class members purchased Goldman stock at the relevant time (after the misstatements were made but before

the truth was revealed). The parties also agree that defendants in a securities fraud class action may submit rebuttal evidence of a lack of price impact at the class certification stage. The principal question on appeal is whether defendants bear the burden of production or persuasion to rebut the *Basic* presumption.

Relying on Rule 301 of the Federal Rules of Evidence and language in *Basic*, defendants argue they need only produce—i.e., offer—evidence of a lack of price impact to rebut the presumption. Rule 301 states that "the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption," while the "burden of persuasion . . . remains on the party who had it originally." FED. R. EVID. 301. Because it is plaintiffs' burden to prove the predominance of class-wide issues and the reliance element of their securities fraud claim, defendants argue plaintiffs also bear the ultimate burden to persuade the court that the statements at issue affected the market price of Goldman stock. According to defendants, that rule comports with the language in *Basic* that "[a]*ny showing* that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff" is sufficient to rebut the presumption of reliance. *Basic,* 485 U.S. at 248 (emphasis added). Defendants contend the District Court imposed an impermissibly high evidentiary burden by requiring them to rebut the *Basic* presumption with conclusive proof of a lack of price impact.

After the District Court granted plaintiffs' motion for class certification, another panel of this Circuit concluded that defendants in a securities fraud class action bear the

burden of persuasion to rebut the *Basic* presumption, and that they must do so by a preponderance of the evidence. *See Barclays*, 875 F.3d at 99. The Court in *Barclays* examined "the development of the presumption and the burden the [Supreme] Court imposed on plaintiffs to invoke it at the class certification stage." *Id.* at 100. It determined that the language in *Basic* that "[a]ny showing that severs the link" between the misstatement and the market price places a burden of persuasion, rather than a burden of production, on defendants seeking to rebut the presumption, because it "requires defendants to do more than merely produce evidence that *might* result in a favorable outcome." *Id.* at 101. They must demonstrate that the misrepresentation did not in fact affect the stock's price. *Id.*; *see also Halliburton II.* 134 S. Ct. at 2405 ("[A] defendant c[an] rebut th[e] presumption in a number of ways, including by showing that the alleged misrepresentation did not actually affect the stock's price— that is, that the misrepresentation had no 'price impact.'").

The *Barclays* court also rejected the argument that Rule 301 of the Federal Rules of Evidence requires defendants only to produce "some" evidence to rebut the presumption. Rule 301 contemplates that a federal statute can alter the traditional rule that the burden of persuasion remains on the party who had it originally. *See* FED. R. EVID. 301 ("unless a federal statute or these rules provide otherwise . . . the burden of persuasion . . . remains on the party who had it originally"). Because the *Basic* presumption is a substantive doctrine of federal law that derives from the securities fraud statutes, *Barclays* determined it altered the default rule and

imposed a burden of persuasion on defendants seeking to rebut it. *See Barclays*, 875 F.3d at 102–03.

That conclusion is consistent with the purpose of the presumption. As the *Barclays* court observed, the *Basic* presumption is essential in putative class actions involving securities fraud plaintiffs "who ha[ve] traded on an impersonal market." *Id.* at 101 (internal quotation marks omitted). It would be "of little value" if defendants could overcome it "by simply producing *some* evidence" of a lack of price impact. *Id.* at 100–01 (emphasis added). Accordingly, the panel concluded that *Basic* and its progeny require defendants seeking to rebut the *Basic* presumption to "demonstrate a lack of price impact by a preponderance of the evidence at the class certification stage rather than merely meet a burden of production." *Id.* at 101.

*Barclays* makes clear that defendants seeking to rebut the *Basic* presumption of reliance must do so by a preponderance of the evidence. *See id.* Although the District Court acknowledged that standard in a footnote its decision, *see In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10 Civ. 3461, 2015 WL 5613150, at *4 n.3, it went on to find that defendants failed to rebut the *Basic* presumption because they did not "conclusively" prove a "complete absence of price impact," *id.* at *7. Because the District Court concluded its findings with these words, it is unclear to us whether the court required more of defendants than a preponderance of the evidence. We therefore vacate the District Court's order and remand for it to reconsider defendants' evidence in light of the *Barclays* standard.

### III. Defendants' Price Impact Evidence

Because we are remanding to the District Court to reconsider defendants' evidence under the *Barclays* standard, one final issue regarding defendants' rebuttal evidence needs mention. In their opposition to class certification, defendants' expert presented evidence of 34 dates before 2010 in which various news sources reported Goldman's conflicts of interest in the Abacus, Hudson, Anderson, and Timberwolf transactions, without any accompanying decline in the price of Goldman stock. The District Court construed this evidence as "an inappropriate truth on the market defense" or as evidence of the statements' lack of materiality, neither of which the court thought it could consider at the class certification stage. *Id.* at *6 (internal quotation marks omitted). We agree with defendants that this was error.

The "truth on the market" defense attacks the timing of the plaintiffs' purchase of shares, not price impact. The theory is, essentially, that the market was already aware of the truth regarding defendants' misrepresentations at the time the class members purchased their shares, meaning the market price had already adjusted to the revelation of defendants' misstatements, and class members could not have relied on those misstatements in choosing to buy stock. *See Amgen*, 568 U.S. at 482; *see also Basic*, 485 U.S. at 248–49.

Contrary to the District Court's characterization of their evidence, defendants did not present a "truth on the market" defense. Defendants did not argue, for example, that Goldman's conflicts of interest were already known to

22

the market at the time plaintiffs purchased their shares of Goldman common stock. Indeed, it was undisputed that plaintiffs purchased their shares after the misstatements were made but before the truth was revealed. Rather, defendants presented evidence that the market learned the truth about Goldman's conflicts of interests in the Abacus, Hudson, Anderson, and Timberwolf transactions on 34 occasions from 2007 to 2009, without any accompanying decline in the price of Goldman stock. Defendants used that evidence to show that their statements about Goldman's efforts to avoid conflicts of interest "did not actually affect the stock's market price." *Halliburton II*, 134 S. Ct. at 2416.

Although price impact touches on materiality, which is not an appropriate consideration at the class certification stage, it "differs from materiality in a crucial respect." *Id*. Price impact "refers to the effect of a misrepresentation on a stock price." *Halliburton I*, 563 U.S. at 814. Whether a misrepresentation was reflected in the market price at the time of the transaction—whether it had price impact—"is *Basic*'s fundamental premise. It . . . has everything to do with the issue of predominance at the class certification stage." *Halliburton II*, 134 S. Ct. at 2416 (internal quotation marks and citation omitted). If a defendant shows that an "alleged misrepresentation did not, for whatever reason, actually affect the market price" of defendant's stock, "there is no grounding for any contention that the investor indirectly relied on that misrepresentation through his reliance on the integrity of the market price"; the fraud-on-the-market theory underlying the presumption would "completely

collapse[]." *Id.* at 2408, 2414 (internal quotation marks and brackets omitted).

Accordingly, the District Court erred in declining to consider defendants' evidence at this stage of the litigation. We espouse no views as to whether the evidence is sufficient to rebut the *Basic* presumption; we hold only that the District Court should consider it on remand, in determining whether defendants established by a preponderance of the evidence that the misrepresentations did not in fact affect the market price of Goldman stock. We encourage the court to hold any evidentiary hearing or oral argument it deems appropriate under the circumstances.

## CONCLUSION

Defendants seeking to rebut the *Basic* presumption of reliance must do so by a preponderance of the evidence. *See Barclays*, 875 F.3d at 99. Because it is unclear whether the District Court applied the correct standard in this case, we VACATE the order of the District Court and REMAND for further proceedings consistent with this opinion.