*Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2018

(Argued: June 26, 2019 | Decided: April 7, 2020)

Docket No. 18-3667

ARKANSAS TEACHER RETIREMENT SYSTEM, WEST VIRGINIA
INVESTMENT MANAGEMENT BOARD, PLUMBERS AND PIPEFITTERS
PENSION GROUP,

*Plaintiffs-Appellees,*

PENSION FUNDS, ILENE RICHMAN, Individually and on behalf of all others
similarly situated,

*Plaintiffs,*

HOWARD SORKIN, Individually and on behalf of all others similarly situated,
TIKVA BOCHNER, On behalf of herself and all others similarly situated, DR.
EHSAN AFSHANI, LOUIS GOLD, Individually and on behalf of all others
similarly situated, THOMAS DRAFT, individually and on behalf of all others
similarly situated,

*Consolidated Plaintiffs,*

v.

GOLDMAN SACHS GROUP, INC., LLOYD C. BLANKFEIN, DAVID A.
VINIAR, GARY D. COHN,

*Defendants-Appellants,*

SARAH E. SMITH,

*Consolidated Defendant*.

_____

Before:

WESLEY, CHIN, and SULLIVAN, *Circuit Judges*.

This is a class action lawsuit brought by shareholders of Defendant-Appellant Goldman Sachs Group, Inc.  The shareholders allege that Goldman and several of its executives committed securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder by misrepresenting Goldman's freedom from, or ability to combat, conflicts of interest in its business practices.  The shareholders argue that several high-profile government fines and investigations revealed the truth of Goldman's flawed conflicts management to the market thereby reducing its share price.

Several years ago, the United States District Court for the Southern District of New York (Crotty, *J.*) certified a shareholder class under Federal Rule of Civil Procedure 23(b)(3).  In 2018, we vacated the class certification order, holding that the district court had failed to apply the "preponderance of the evidence" standard for determining whether Goldman had rebutted a legal presumption, known as the *Basic* presumption, that the shareholders relied on Goldman's alleged misstatements in purchasing its stock at the market price.  We remanded for the court to apply the correct standard and to consider Goldman's evidence intended to rebut the *Basic* presumption.

On remand, the district court certified the class once more.  Goldman argues on legal and evidentiary grounds that this decision was an abuse of discretion.  On the law, Goldman contends that the court misapplied the inflation-maintenance theory for demonstrating price impact.  It also argues that we should modify the theory to exclude what it terms "general statements."  On the evidence, Goldman argues that the court erroneously rejected its rebuttal evidence in holding that it failed to rebut the *Basic* presumption.

The district court applied the correct legal standard and we find no abuse of discretion in its weighing of Goldman's rebuttal evidence.  We **AFFIRM**.  Judge Sullivan dissents in a separate opinion.

_____

ROBERT J. GIUFFRA, JR. (Richard H. Klapper, David M.J. Rein, Benjamin R. Walker, Jacob E. Cohen, *on the brief*), Sullivan & Cromwell LLP, New York, NY, *for Defendants-Appellants*.

THOMAS C. GOLDSTEIN, Goldstein & Russell, P.C., Bethesda, MD (Kevin K. Russell, Goldstein & Russell, P.C., Bethesda, MD; Spencer A. Burkholz, Joseph D. Daley, Robbins Geller Rudman & Dowd LLP, San Diego, CA; Thomas A. Dubbs, James W. Johnson, Michael H. Rogers, Irina Vasilchenko, Labatow Sucharow LLP, New York, NY, *on the brief*), *for Plaintiffs-Appellees*.

Lewis J. Liman, Cleary Gottlieb Steen & Hamilton LLP, New York, NY (Jared M. Gerber, Lina Bensman, Cleary Gottlieb Steen & Hamilton LLP, New York, NY; Steven P. Lehotsky, U.S. Chamber Litigation Center, Washington, D.C., *on the brief*), *for Amicus Curiae Chamber of Commerce of the United States of America in Support of Defendants-Appellants*.

Todd G. Cosenza (Maxwell A. Bryer, *on the brief*), Willkie Farr & Gallagher LLP, New York, NY, *for Amici Curiae Former United States Securities and Exchange Commission Officials and Securities Scholars in Support of Defendants-Appellants*.

Michael C. Keats, Fried, Frank, Harris, Shriver & Jacobson LLP, New York, NY, *for Amici Curiae Economic Scholars in Support of Defendants-Appellants*.

Jonathan K. Youngwood, Simpson Thacher & Bartlett LLP, New York, NY (Craig S. Waldman, Joshua C. Polster, Daniel H. Owsley, Simpson Thacher & Bartlett LLP, New York, NY; Ira D. Hammerman, Kevin M. Carroll, Securities Industry and Financial Markets Association, Washington, D.C.; Gregg Rozansky, Bank Policy Institute, Washington, D.C., *on the brief*), *for Amici Curiae Securities Industry and Financial Markets*

*Association and Bank Policy Institute in Support of Defendants-Appellants.*

Deepak Gupta, Gupta Wessler PLLC, Washington, D.C. (Gregory A. Beck, Gupta Wessler PLLC, Washington, D.C.; Salvatore J. Graziano, Jai K. Chandrasekhar, Bernstein Litowitz Berger & Grossmann LLP, New York, NY, *on the brief*), *for Amici Curiae Securities Law Scholars in Support of Plaintiffs-Appellees.*

Marc I. Gross, Pomerantz LLP, New York, NY (Jeremy A. Lieberman, Pomerantz LLP, New York, NY; Ernest A. Young, Apex, NC, *on the brief*), *for Amici Curiae Procedure Scholars in Support of Plaintiffs-Appellees.*

J. Carl Cecere, Cecere PC, Dallas, TX (David Kessler, Darren Check, Kessler Topaz Meltzer & Check LLP, Radnor, PA, *on the brief*), *for Amicus Curiae National Conference on Public Employee Retirement Systems in Support of Plaintiffs-Appellees.*

———————————

WESLEY, *Circuit Judge*:

This is the second time this securities class action has arrived at our doorstep on a Rule 23(f) appeal. The first time we took the case, the United States District Court for the Southern District of New York (Crotty, *J.*) had certified under Rule 23(b)(3) a shareholder class suing Goldman Sachs Group, Inc. and a handful of its executives (collectively, "Goldman") for securities fraud. We vacated the class certification order, holding that the district court did not apply the "preponderance of the evidence" standard for determining whether Goldman had

4

rebutted a legal presumption, known as the *Basic* presumption, that the shareholders relied on Goldman's allegedly material misstatements in choosing to purchase its stock at the market price. *See Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.* (*ATRS I*), 879 F.3d 474, 484–85 (2d Cir. 2018); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 245–48 (1988). We also held that the court erroneously declined to consider some of Goldman's evidence of "price impact"—that is, the question of whether the revelation that Goldman's statements were false affected its share price. *See ATRS I*, 879 F.3d at 485–86.

On remand, the district court ordered additional briefing and held an evidentiary hearing. After concluding that Goldman failed to rebut the *Basic* presumption by a preponderance of the evidence, the court certified the class once more. *See In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10 Civ. 3461 (PAC), 2018 WL 3854757 (S.D.N.Y. Aug. 14, 2018). We again granted Goldman's petition for permission to appeal under Rule 23(f).

The question before us is whether the district court abused its discretion by certifying the shareholder class, either on legal grounds or in its application of the *Basic* presumption. For the following reasons, we hold that it did not.

5

# BACKGROUND

## A. Factual Background

The facts giving rise to this lawsuit are discussed at length in our prior opinion. *See ATRS I*, 879 F.3d 478–82. All that is required here is an abridged version.

Between 2006 and 2010, Goldman made the following statements about its business practices:

> Our reputation is one of our most important assets. As we have expanded the scope of our business and our client base, we increasingly have to address potential conflicts of interest, including situations where our services to a particular client or our own proprietary investments or other interests conflict, or are perceived to conflict, with the interest of another client . . . .

> We have extensive procedures and controls that are designed to identify and address conflicts of interest . . . .

> Our clients' interests always come first. Our experience shows that if we serve our clients well, our own success will follow. . . .

> We are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us. Our continued success depends upon unswerving adherence to this standard. . . .

> Most importantly, and the basic reason for our success, is our extraordinary focus on our clients. . . .

> Integrity and honesty are at the heart of our business.

J.A. 87–88, 93 (alterations omitted).  The Plaintiffs-Appellees ("shareholders")—

individuals and institutions holding shares of Goldman's common stock—allege

that these statements were false because Goldman made them while knowing that

it was riddled with undisclosed conflicts of interest.

The conflicts at issue here surround several collateralized debt obligation

("CDO") transactions involving subprime mortgages.  Chief among them is the

Abacus 2007 AC-1 ("Abacus") transaction.  Publicly, Goldman marketed Abacus

as an ordinary asset-backed security, through which investors could buy shares in

bundles of mortgages that the investors, and presumably Goldman, hoped would

succeed.  But behind the scenes, Goldman purportedly allowed the hedge fund

Paulson & Co. to play an active role in selecting the mortgages that constituted the

CDO.  And Paulson, which bet against the success of the Abacus investment

through short sales, chose risky mortgages that it "believed would perform poorly

or fail."  *Id.* at 59.  The alleged plan worked, and Paulson made roughly $1 billion

at the expense of the CDO investors (who are not the plaintiffs here).  Goldman

ultimately admitted that it failed to disclose Paulson's role in the portfolio

selection, and it reached a $550 million settlement with the SEC—the largest-ever

penalty paid by a Wall Street firm at the time.  *See generally* Press Release, SEC,

7

*Goldman Sachs to Pay Record $550 Million to Settle SEC Charges Related to Subprime Mortgage CDO* (July 15, 2010), https://www.sec.gov/news/press/2010/2010-123.htm. Goldman allegedly engaged in similar conduct with respect to three other CDOs. At times, Goldman allegedly represented to its investors that it was aligned with them when it was in fact short selling against their positions.

### B. Early Litigation History

In 2011, the named plaintiffs filed a class action complaint in the United States District Court for the Southern District of New York, seeking under Federal Rule of Civil Procedure 23(b)(3) to represent a class of all individuals and entities that acquired shares of Goldman's common stock between February 5, 2007 and June 10, 2010. They alleged that Goldman and several of its directors violated § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. The crux of their claim is that Goldman's representations about being conflict free artificially maintained an inflated stock price and that the revelations of Goldman's conflicts, such as those presented by the SEC in its complaint against Goldman concerning the Abacus deal, were "corrective disclosures" that caused the market to devalue their

Goldman shares.[1]  They noted, for example, that Goldman's share price dropped 13% when the SEC filed a securities-fraud complaint against Goldman in connection with the Abacus transaction, and that it dropped even further on two later dates when news broke that several federal agencies were investigating Goldman for its role in the other conflicted transactions.  In the shareholders' view, these announcements revealed to the market that Goldman had created "clear conflicts of interest with its own clients" by "intentionally packag[ing] and s[elling] . . . securities that were designed to fail, while at the same time reaping billions for itself or its favored clients by taking massive short positions" in the same transactions.  J.A. 49.  They claim that they lost over $13 billion as a result of Goldman's fraud.

Goldman moved to dismiss the complaint under Federal Rules of Civil Procedure 9(b) and 12(b)(6).  It argued that the alleged misstatements were not, as the securities law requires, "material."[2]  This was because, in Goldman's view, the

---

[1] A "corrective disclosure" is an announcement or series of announcements that reveals to the market the falsity of a prior statement.  *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005).

[2] The six elements of securities fraud are "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission

9

statements were too general and vague for a reasonable shareholder to have relied on them in determining the value of Goldman's stock. Thus, Goldman argued, the statements had no impact on its stock price, and any loss the shareholders suffered was due to something other than the corrective disclosures. The district court largely disagreed, holding that most of Goldman's statements presented an actionable question of materiality. *See Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 276, 280 (S.D.N.Y. 2012). The court did, however, agree with Goldman that some of its statements were immaterial as a matter of law; it dismissed the complaint to the extent it relied upon those statements. *See id.* at 274. The court subsequently denied Goldman's motions for reconsideration of, and an interlocutory appeal from, the order denying the motion to dismiss. *See In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10 Civ. 3461 (PAC), 2014 WL 2815571, at *6 (S.D.N.Y. June 23, 2014) (reconsideration); *In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10 Civ. 3461 (PAC), 2014 WL 5002090, at *3 (S.D.N.Y. Oct. 7, 2014) (appeal).

---

and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

## C. Class Certification and the First Appeal

Following discovery, the shareholders moved for class certification. To certify a class under Rule 23 of the Federal Rules of Civil Procedure, the named plaintiffs must demonstrate (1) that the class is so numerous that joinder is impracticable, (2) that at least one question of law or fact is common to the class, (3) that the class representatives' claims are typical of the classwide claims, and (4) that the class representatives will be able to fairly and adequately protect the interests of the class. *See* Fed. R. Civ. P. 23(a). Goldman did not contest that these requirements were met. Instead, it focused on an additional prerequisite for classes primarily seeking money damages, found in Rule 23(b)(3), that common questions of law or fact predominate over individual questions that pertain only to certain class members. *See id.* 23(b)(3).

Facially, securities fraud appears to be a bad fit for the predominance requirement because the key question is whether each individual shareholder relied on a defendant's misstatement in choosing to purchase its stock. But under *Basic Inc. v. Levinson*, 485 U.S. 224, courts may presume reliance on a classwide basis if the plaintiffs "establish certain prerequisites—namely, that [the] defendants' misstatements were publicly known, their shares traded in an efficient

11

market, and [the] plaintiffs purchased the shares at the market price after the misstatements were made but before the truth was revealed." *ATRS I*, 879 F.3d at 481; *see Halliburton Co. v. Erica P. John Fund, Inc.* (*Halliburton II*), 573 U.S. 258, 268 (2014).[3] The idea behind *Basic* is that investors presume that theoretically efficient markets, such as the New York Stock Exchange or Nasdaq, incorporate all public information—including material misstatements—into a share price. *See* 485 U.S. at 246; *see generally* 7 William B. Rubenstein, *Newberg on Class Actions* §§ 22:16, 22:81 (5th ed.).

Plaintiffs seeking to invoke the *Basic* presumption need not *directly* prove that the defendant's statements had price impact—that is, an effect on its share price. *See Halliburton II*, 573 U.S. at 278–79. They may instead rely on the requirements for invoking the *Basic* presumption as an "indirect proxy" for a showing of price impact. *See id.* at 281. "But an indirect proxy should not preclude . . . a defendant's direct, more salient evidence showing that the alleged misrepresentation did not actually affect the stock's market price and, consequently, that the *Basic* presumption does not apply." *Id.* at 281–82; *see also*

---

[3] Materiality is also a prerequisite for *Basic,* but class members need not prove it prior to class certification. *See Halliburton II*, 573 U.S. at 276.

12

*Basic*, 485 U.S. at 248 (noting that "[a]ny showing that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff . . . will be sufficient to rebut the presumption of reliance" because "the basis for finding that the fraud had been transmitted through market price would be gone").

Goldman attempted to rebut the *Basic* presumption in several ways. It introduced an event study designed to show that its alleged misstatements had no impact on its share price.[4] It also argued that the market did not react on several dozen occasions before the corrective-disclosure dates when media outlets reported on its alleged conflicts of interest; and, thus, the market was indifferent to this information when it appeared in the corrective disclosures. Under Goldman's theory, its share price declined solely because of new information

---

[4] An event study isolates the stock price movement attributable to a company (as opposed to market-wide or industry-wide movements) and then examines whether the price movement on a given date is outside the range of typical random stock price fluctuations observed for that stock. If the isolated stock price movement falls outside the range of typical random stock price fluctuations, it is statistically significant. If the stock price movement is indistinguishable from random price fluctuations, it cannot be attributed to company-specific information announced on the event date. *See* Mark L. Mitchell & Jeffry M. Netter, *The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission*, 49 Bus. Law. 545, 556–69 (1994); *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253–56 (2d Cir. 2016).

contained in the corrective disclosures: that several federal agencies were enforcing the securities laws against Goldman with investigations and fines for the same allegedly fraudulent trading practices.

The district court rejected Goldman's theory and certified the class. *See In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10 Civ. 3461 (PAC), 2015 WL 5613150 (S.D.N.Y. Sept. 24, 2015). We vacated this decision on appeal. *See ATRS I*, 879 F.3d at 478. We began our analysis by noting Goldman's concession that the shareholders successfully invoked the *Basic* presumption. *Id.* at 484. But as to the rebuttal stage, we found that the district court failed to apply the "preponderance of the evidence" standard, which our Court had clarified in an intervening decision. *Id.* at 485 (citing *Waggoner v. Barclays PLC*, 875 F.3d 79, 101 (2d Cir. 2017)). We also found that, in making this determination, the court mistakenly concluded that certain price-impact evidence Goldman had sought to introduce was irrelevant under Rule 23. *Id.* at 486. We remanded for the court to reconsider, under the correct standard and with this additional evidence, whether Goldman could rebut the *Basic* presumption. *Id.* We offered no views on the merits of that question or the sufficiency of Goldman's rebuttal evidence. *Id.*

**D. Proceedings on Remand**

On remand, the district court accepted supplemental briefs from the parties and held an evidentiary hearing and oral argument. It framed the issue as whether Goldman could "demonstrate[], by a preponderance of the evidence, that the alleged misstatements had no price impact." *In re Goldman*, No. 10 Civ. 3461 (PAC), 2018 WL 3854757, at *2.

Although Goldman bore the burden of persuasion, the district court first looked to the shareholders' evidence intended to show the shortcomings of Goldman's rebuttal argument. It characterized the shareholders' claims as resting on an "inflation-maintenance" theory: that "the misstatements themselves did not inflate the stock price, [but] allegedly served to maintain an already inflated stock price." *Id.*[5] The court credited evidence from Dr. John D. Finnerty, the shareholders' expert who testified at the evidentiary hearing, "that the news of Goldman's conflicts on the . . . corrective disclosure dates negatively impacted

---

[5] This theory is sometimes referred to as the "price-maintenance theory," and what we term "inflation-maintaining statements" are sometimes called "price-maintaining statements." We use the "inflation" language because it is more precise and the phrase "price-maintenance" also has currency in antitrust law. *See also Vivendi*, 838 F.3d at 258 (dubbing this doctrine the "inflation-maintenance theory").

Goldman's stock price." *Id.* at *4. It concluded that "Dr. Finnerty's model, at the very least, establishes a link between the news of Goldman's conflicts and the subsequent stock price declines." *Id.*

The district court then turned to evidence presented by two of Goldman's experts to rebut the *Basic* presumption. The first expert, Dr. Paul Gompers, cited news articles published on thirty-six dates prior to the corrective disclosures discussing aspects of Goldman's conflicts. Asserting that the content of the reports was no different than the content of the corrective disclosures, and noting that Goldman's share price did not meaningfully move on the dates of the reports, Dr. Gompers concluded that the market was indifferent to the news of Goldman's conflicts. The court found this evidence was "not persuasive." *Id.* Although it agreed (as did Dr. Finnerty) that Goldman's stock price did not move on the thirty-six dates, it found that "[t]he absence of price movement, . . . in and of itself, is not sufficient to sever the link between the first corrective disclosure and the subsequent stock price drop." *Id.* This was because "the [Abacus] complaint was the first to expose hard evidence of Goldman's client conflicts" by its inclusion of "direct quotes from damning emails . . . [and] internal memoranda, disclosing hard evidence that Goldman had indeed engaged in conflicts to its own

advantage." *Id.* at *5. The court found that this hard evidence and other "material information" about "the nature and extent of Goldman's client conflicts" "had not been described in any of the 36 more generic reports on conflicts." *Id.* at *4.[6] It found that Dr. Gompers did not "credibly explain[] how such hard evidence did not contribute to the price decline following the first corrective disclosure." *Id.* at *5.

The district court was similarly unpersuaded by Goldman's second expert, Dr. Stephen Choi. Dr. Choi presented an event study concluding that, because "the conflicts were reported on 36 separate occasions with no price movement, the . . . price drops [following the corrective disclosures] must have been due exclusively to the news of enforcement activities [such as the Abacus complaint]." *Id.* at *3 (citation omitted). Dr. Choi identified three "factors" descriptive of the Abacus complaint: it was not accompanied by a concurrent resolution, it included scienter-based allegations, and it charged an individual defendant in addition to Goldman. *Id.* He used a data set of 117 enforcement actions and identified four

[6] The court noted that the articles "vary significantly" and that, while some "suggest possible or theoretical conflicts[,] . . . others appear to be a *cri de couer* from sworn enemies . . . [or] not damaging or revelatory, but rather commendatory . . . prais[ing] Goldman for managing its conflicts and still outperforming competitors." *Id.* at *4 n.6.

involving these same factors. The average share price decline following those four enforcement events was 8.07%. Because Goldman's share price declined by 9.27% following the Abacus disclosure, and Dr. Choi found that the 1.2% difference was not statistically significant, he opined that the entire price drop was due to the news of the enforcement action, rather than the revelation of Goldman's conflicts.

The district court found that "Dr. Choi's conclusion [was] not supported by his event study." *Id.* at *5. To begin, it noted that Dr. Choi looked only at the Abacus complaint and did not examine the other corrective disclosures; the court found there was "no good reason to extend [his] findings" to those disclosures. *Id.* The court also found Dr. Choi's three "factors" were "arbitrary characteristics," emphasizing that Dr. Choi conceded "he was the first person to use [the factors] together" and that the factors "are not generally accepted in the field." *Id.* The court then explained that the four enforcement events from Dr. Choi's study were different than the Abacus event because they did not involve allegations of mismanagement of conflicts of interest or companies with comparable size or operations to Goldman. The court further found the event study did not account for the misconduct allegations underlying each event. It also noted that Dr. Choi's study did not produce statistically significant results because it looked to the

18

average price decline of only four events (out of a population of 117) with a large variance: declines of 3.34%, 3.73%, 8.13%, and 17.09%. Finally, the court faulted Dr. Choi for comparing the Goldman price decline to the four events using a two-sample t-test, which some authorities have explained "is not appropriate for small samples drawn from a population that is not [statistically] normal." *Id.* at *6 (quoting *Butt v. United Bhd. of Carpenters & Joiners of Am.*, 2016 WL 3365772, at *1 (E.D. Pa. June 16, 2016) (quoting Federal Judicial Center, Reference Manual on Scientific Evidence (3d ed.))).

In light of Goldman's deficient evidence, and reaffirming that "Dr. Finnerty's opinion demonstrate[ed] the price impact of [the] alleged misstatements," the district court held that Goldman "failed to rebut the *Basic* presumption by a preponderance of the evidence." *Id.* at *6. It certified the class. *Id.* We granted Goldman's petition for interlocutory appeal.

## DISCUSSION

"[W]e review the [district court's] grant of class certification for an abuse of discretion, and the legal conclusions underlying that decision *de novo*." *ATRS I*, 879 F.3d at 482 n.7. "When a case involves the application of legal standards, we

19

look at whether the [district court's] application 'falls within the range of permissible decisions.'" *Id.* (quoting *Waggoner*, 875 F.3d at 92).

Goldman argues for reversal on two general grounds. *First*, it contends that the district court misapplied the inflation-maintenance theory, which it asks us to modify. *Second*, based largely on the court's evidentiary findings, Goldman argues that the court abused its discretion by holding that Goldman failed to rebut the *Basic* presumption by a preponderance of the evidence.

## I. The District Court Correctly Applied the Inflation-Maintenance Theory, and We Reject Goldman's Invitation to Narrow It.

In the classic § 10(b) case, a corporation's shareholders allege that a corporation, in financial statements or through its officers, made false statements that caused them to overvalue its stock. As noted above, the question of whether the statements actually affected the market price is called "price impact." We have held that two types of false statements can have price impact. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 257 (2d Cir. 2016). The first category is inflation-introducing statements. Shareholders relying on an inflation-introduction theory claim that the corporation's false statements "introduced" inflation into its share price because the market believed them to be true and reacted accordingly. *See id.*

The second category is inflation-maintaining statements. These statements have price impact not because they introduce inflation into a share price, but because they "maintain" it. *See id.* Imagine, for example, that major media outlets report a false rumor that a record label plans to sell a secretly recorded Beatles album containing a dozen unreleased songs. Although the record company played no role in starting or spreading this rumor, its share price increases from $60 to $70 because the market believes the rumor and thinks the album will be profitable. Not wanting to disappoint the public, the company's CEO confirms the rumor even though she knows it is false. While the CEO's misstatement does not move the record company's share price—which stays at $70 because the market has already incorporated the album's predicted profits—the statement is fraudulent because it maintains the artificial inflation. Had the CEO told the truth, the share price would have returned to $60. The "inflation-maintenance" theory allows shareholders to claim they relied on statements like these when suing for securities fraud.

Our original case on the inflation-maintenance theory is *Vivendi*, 838 F.3d 223. There, we joined the Seventh and Eleventh Circuits in holding that "theories of 'inflation maintenance' and 'inflation introduction' are not separate legal

categories."  *Id.* at 259 (quoting *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 418 (7th Cir. 2015), and citing *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1316 (11th Cir. 2011)).  On that basis, we held, "securities-fraud defendants cannot avoid liability for an alleged misstatement merely because the misstatement is not associated with an uptick in inflation."  *Id.*

Goldman raises two objections to the district court's application of the inflation-maintenance theory: (A) in its view, the theory applies only when alleged misstatements prop up "fraud-induced inflation" and the court failed to make a finding to this effect; and (B) the court erred by finding that what Goldman describes as "general statements" can ever satisfy the inflation-maintenance theory.

A. **The Inflation-Maintenance Theory Does Not Require Proof of Fraud-Induced Inflation, and the District Court Applied the Correct Standard in Concluding that Goldman's Share Price Was Inflated.**

It should be apparent that a statement cannot maintain price inflation unless the price is already inflated.  *See id.* at 255.  Accordingly, a court allowing plaintiffs to claim inflation maintenance must make a finding of price inflation.  The parties

agree on this basic principle.  But Goldman would add that the price inflation must have been "fraud-induced."  It draws this putative rule from *Vivendi*.[7]

*Vivendi* said no such thing.  In fact, the sentence from which Goldman plucks "fraud-induced" contradicts Goldman's claim.  "*Artificial inflation is not necessarily fraud-induced*, for a falsehood can exist in the market (and thereby cause artificial inflation) for reasons unrelated to fraudulent conduct."  *Id.* at 256 (emphasis added).  Accordingly, "the question of . . . liability for securities fraud . . . does [not] rest on whether the market originally arrived at a misconception about the model's safety on its own, or whether the company led the market to that misconception in the first place."  *Id.* at 259.[8]

---

[7] Appellant Br. 29 ("Although a stock's price can be inflated for any number of reasons, the securities laws are concerned only with 'fraud-induced' inflation, *Vivendi*, 838 F.3d at 256, which is 'the difference between the stock price and what the price would have been if the defendants had spoken truthfully,' *Glickenhaus*, 787 F.3d at 418.").

[8] The *Vivendi* defendant made essentially the same argument as Goldman in opposing the adoption of the inflation-maintenance theory.  In rejecting it, we explained its inconsistency with the theory.

> [I]t is hardly illogical or inconsistent with precedent to find that a statement may cause inflation not simply by *adding* it to a stock, but by maintaining it. Were this not the case, companies could eschew securities-fraud liability whenever they actively perpetuate (*i.e.*, though affirmative misstatements) inflation that is already extant in their stock price, as long as they cannot be found liable for whatever originally introduced the inflation. Indeed, under

23

Thus, the actual issue is simply whether Goldman's share price was inflated.

Goldman argues that the district court made no finding to this effect. We disagree.

This Court, like every Court of Appeals that has adopted the inflation-maintenance theory, has held that if a court finds a disclosure caused a reduction in a defendant's share price, it can infer that the price was inflated by the amount of the reduction. *See id.* at 255 ("The best way to determine the impact of a false statement is to observe what happens when the truth is finally disclosed and use that to work backward, on the assumption that the lie's positive effect on the share price is equal to the additive inverse of the truth's negative effect." (quoting *Glickenhaus*, 787 F.3d at 415)).

The district court found that "[t]he inflation was demonstrated on [the corrective-disclosure] dates, when the falsity of the misstatements was revealed." *In re Goldman*, No. 10 Civ. 3461 (PAC), 2018 WL 3854757, at *2. It also credited Dr. Finnerty's testimony that "the price declines following these corrective disclosures

---

Vivendi's approach, companies (like Vivendi) would have every incentive to maintain inflation that already exists in their stock price by making false or misleading statements.

*Vivendi*, 838 F.3d at 258.

24

were caused by the news of Goldman's conflicts." *Id.* We find no abuse of discretion in the court's finding that the inflation maintained by Goldman's statements equaled the price drop caused by the corrective disclosures.

### B. We Decline Goldman's Request to Narrow the Inflation-Maintenance Theory.

Although these findings satisfy the inflation-maintenance doctrine, Goldman asks us to narrow the doctrine's focus. Under Goldman's proposed revision, what it terms "general statements" would be legally insufficient as evidence of price impact. Plaintiffs relying on such statements would be unable to invoke the *Basic* presumption of classwide reliance and would therefore be unable to demonstrate under Rule 23(b)(3) that classwide issues (*i.e.*, reliance on the defendant's misstatements) predominate over individual issues.

Goldman's theory is as follows. In its view, "[c]ourts have applied the narrow price maintenance theory only in two 'special circumstances.'" Appellant Br. 35 (citation omitted).[9] The first is "'unduly optimistic statement[s]' about

___

[9] Although Goldman repeatedly frames inflation maintenance as a "narrow" alternative to inflation introduction, this is incorrect. In the wake of the Supreme Court's 2014 decision in *Halliburton II*, securities plaintiffs invoked the inflation-maintenance theory in 20/28 (71%) of federal district court cases involving a defendant's attempt to rebut the

specific, material financial or operational information made to 'stop[] a [stock] price from declining." *Id.* (quoting *Schleicher v. Wendt*, 618 F.3d 679, 683 (7th Cir. 2010)). The second is statements "falsely 'convey[ing] that the company ha[s] met market expectations' about a specific, material financial metric, product, or event." *Id.* (quoting *In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1340–41 (N.D. Ga. 2007)). Unsurprisingly, Goldman argues that neither special circumstance accounts for the alleged misstatements at issue here.

In effect, what Goldman has done is surveyed nationwide inflation-maintenance cases (some Rule 23 decisions, some not), claimed that each case fits one of its special circumstances, and thereby concluded that these are the *only* permissible applications of the theory. The problem for Goldman is that none of these cases held that the inflation-maintenance theory applies so narrowly, at the Rule 23 stage or otherwise. Nor do they distinguish "general" statements from

---

*Basic* presumption. *See* Note, *Congress, the Supreme Court, and the Rise of Securities-Fraud Class Actions*, 132 Harv. L. Rev. 1067, 1077 (2019). In all twenty of those cases, the district court held that the defendant failed to rebut the *Basic* presumption. *Id.*

"specific" ones. They simply apply the theory, which every Court of Appeals to adopt it has held covers all material misstatements, to the facts before them.[10]

Goldman concedes that *ATRS I* "did not address whether general statements, like those challenged here, are capable of maintaining inflation in a stock price as a matter of law" for the purpose of class certification. *Id.* at 48. It characterizes the issue as one of "first impression in this Circuit." *Id.* In its view, we should adopt this rule because the Supreme Court's decision in *Halliburton II* allows lower courts to consider evidence of price impact at the Rule 23 stage, and so-called general statements like those at issue here "are incapable of maintaining inflation in a stock price for the same reasons that those statements are immaterial as a matter of law (as well as fact)." *Id.* (citing *Halliburton II*, 573 U.S. at 283).

We reject Goldman's proposed revision of our inflation-maintenance doctrine.

---

[10] It is unsurprising that Goldman's survey of Rule 23 cases did not uncover ones involving truly general statements. As explained below, courts regularly dismiss securities claims predicated on such statements under Rule 12(b)(6) because they are too immaterial to induce reliance. Because courts virtually never entertain contested Rule 23 motions prior to the conclusion of the pleading stage, class certification opinions rarely involve what Goldman deems to be impermissibly general statements. Put differently, Rule 12(b)(6) weeds out unmeritorious cases before they ever get to the Rule 23 stage.

As noted earlier, one of the elements a securities plaintiff must prove to succeed on her claim is that the defendant's misstatements were "material" enough to induce the reliance of reasonable shareholders. But "materiality . . . is not an appropriate consideration at the class certification stage." *ATRS I*, 879 F.3d at 486. "Because a failure of proof on the issue of materiality . . . does not give rise to any prospect of individual questions overwhelming common ones, materiality need not be proved prior to Rule 23(b)(3) class certification." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 474 (2013).[11]

Goldman is not formally asking for a materiality test. But its "special circumstances" test would commandeer the inflation-maintenance theory by essentially requiring courts to ask whether the alleged misstatements are, in

---

[11] Goldman argues that it can challenge materiality at the Rule 23 stage. In its view, *Amgen* held only that Rule 23 courts "*need not*" consider materiality, not that they *may not* do so. To whatever extent *Amgen* is ambiguous, *Halliburton II* is clear that Rule 23 courts *may not* consider materiality. *See* 573 U.S. at 282 ("[M]ateriality . . . *should be left to the merits stage*, because it does not bear on the predominance requirement of Rule 23(b)(3)." (emphasis added)). And *ATRS I* conclusively settled the matter in this circuit.

Goldman's words, "immaterial as a matter of law." Appellant Br. 48. This is the precise question posed by materiality.[12]

Goldman's authority for what constitutes an impermissibly "general statement" provides further evidence that its "special circumstances" test is really a means for smuggling materiality into Rule 23. Its brief contains a table of nearly a dozen cases holding that "general statements . . . about business principles and conflicts controls are too general to cause a reasonable investor to rely upon them." *Id.* at 43–46 (quotation marks and citation omitted). But every one of these cases is the dismissal of a securities claim under Rule 12(b)(6) on the ground that the alleged misstatements were too general to be material.[13] None of them concern

---

[12] *See, e.g., United States v. Litvak*, 808 F.3d 160, 175 (2d Cir. 2015) ("Where the misstatements are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance, we may find the misstatements *immaterial as a matter of law*." (emphasis added, quotation marks and citation omitted)).

[13] *See, e.g., In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *36 (S.D.N.Y. Sept. 28, 2012) (holding on a motion to dismiss that "the statements are non-actionable puffery and do not constitute material misstatements"), *aff'd sub nom.*, 752 F.3d 173 (2d Cir. 2014); *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 97–98 (2d Cir. 2016) (holding on a motion to dismiss the challenged statements do not "ris[e] to the level of materiality required to form the basis for assessing a potential investment").

the issue here of whether so-called general statements that made it past the pleading stage can survive under Rule 23.

Of course, just because something looks like materiality does not mean it is materiality. Price impact also resembles materiality, but defendants may attempt to disprove it at class certification. *See Halliburton II*, 573 U.S. at 282. But here, we need not elevate function over form. There are three compelling reasons for rejecting Goldman's argument.

*First*, and most fundamentally, Goldman's proposed rule is difficult to square with Rule 23(b)(3). Whether alleged misstatements are too general to demonstrate price impact has nothing to do with the issue of whether common questions predominate over individual ones. While Goldman's test might weed out potentially unmeritorious claims, Rule 23 is not a weed whacker for merits problems. As the Supreme Court explained in *Amgen*:

> Although we have cautioned that a court's class-certification analysis must be "rigorous" and may "entail some overlap with the merits of the plaintiff's underlying claim," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (internal quotation marks omitted), *Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage*. Merits questions may be considered to the extent— *but only to the extent*—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.

568 U.S. at 465–66 (emphasis added).[14] This is why materiality is irrelevant at the Rule 23 stage. Win or lose, the issue is common to all class members. *Id.* at 468.

The same is true here, in no small part because Goldman's test is materiality by another name. If general statements cannot maintain price inflation *because* no reasonable investor would have relied on them, then the question of inactionable generality is common to the class. For that reason, "the class is entirely cohesive: It will prevail or fail in unison. In no event will the individual circumstances of particular class members bear on the inquiry." *Id.* at 460.

*Second*, Goldman's formulation of the inflation-maintenance theory is at odds with *Vivendi*. That opinion, relying on the Seventh and Eleventh Circuits whose doctrine it adopted, noted that "theories of 'inflation maintenance' and 'inflation introduction' are not separate legal categories.'" *Vivendi*, 838 F.3d at 259 (quoting *Glickenhaus*, 787 F.3d at 418).[15] Goldman's proposed rule, by applying only to inflation-maintaining statements, would make inflation maintenance and

---

[14] *See also, e.g.*, *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 81 (2d Cir. 2015) (applying *Amgen*'s rule); *Fezzani v. Bear, Stearns & Co. Inc.*, 777 F.3d 566, 569–70 (2d Cir. 2015) (same).

[15] *See also Vivendi*, 838 F.3d at 259 (quoting *FindWhat*, 658 F.3d at 1316, for the proposition that "[t]here is no reason to draw any legal distinction between fraudulent statements that wrongfully *prolong* the presence of inflation in a stock price and fraudulent statements that initially *introduce* that inflation").

inflation introduction "separate legal categories."  Goldman points to no authority holding that "general statements" like those supposedly at issue here are legally insufficient to establish inflation introduction.

*Third*, this Court has implicitly rejected Goldman's "special circumstances" test.  *Waggoner*, a Rule 23(f) appeal allowing shareholder plaintiffs to invoke the inflation-maintenance theory, involved claims that a high-ranking Barclays trader told a magazine that it "monitored activity in [a certain high-frequency exchange] and would remove traders who engaged in conduct that disadvantaged [its] clients."  875 F.3d at 87.  The trader elsewhere stated that the high-frequency system was "built on transparency" and "had safeguards to manage toxicity, and to help its institutional clients understand how to manage their interactions with high-frequency traders."  *Id.* (citation, quotation marks, and brackets omitted).

It is true that Barclays' statements were about a specific high-frequency exchange, while Goldman's challenged statements were more generally about its controls for handling conflicts of interest.  But Goldman's alleged lack of, or disregard for, these controls is the specific problem that led to the corrective disclosures.  *See, e.g.*, J.A. 5716 (quoting Goldman as alleging to have "extensive procedures and controls that are designed to identify and address conflicts of

32

interest"). That Barclays mentioned a specific exchange does little to distinguish its statements from those at issue here; each is an alleged misrepresentation about general business practices.

* * *

We are not blind to the widespread understanding that class certification can pressure defendants into settling large claims, meritorious or not, because of the financial risk of going to trial. *See, e.g.*, *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1298 (7th Cir. 1995) (Posner, *J.*). Rule 23's *in terrorem* effect is the reason Congress authorized interlocutory appeals under Rule 23(f). *See* Fed R. Civ. P. 23 advisory committee's note (1998).

Referencing these legitimate policy concerns, Goldman argues that rejecting its theory would open the floodgates to unmeritorious litigation by allowing courts to certify classes that it believes should lose on the merits. Specifically, it argues that "[i]f allegations of misconduct caused a stock to drop, then investor plaintiffs could just point to any general statement about the company's business principles or risk controls and proclaim 'price maintenance.'" Appellant Br. 52–53.

This would indeed be troubling. But our law already beats back this parade of horribles in three meaningful ways.

*First*, materiality challenges are fair game under Rule 12(b)(6). Dismissal at that early stage of the litigation prevents the case from ever reaching Rule 23. As Goldman's table of materiality cases demonstrates, courts regularly dismiss securities complaints because the challenged statements were too general to have induced reliance. In fact, the district court *in this case* dismissed some of the alleged misstatements for this very reason. *See Richman*, 868 F. Supp. 2d at 274. As to the statements before us now, the court rejected Goldman's materiality challenge, holding that the shareholders plausibly stated a claim for securities fraud. *Id.* at 279–80. Right or wrong, we lack the authority to review that decision at this time.[16] Rule 23 does not give defendants a do-over on materiality.[17]

*Second*, the Federal Rules of Civil Procedure do offer securities defendants a do-over on materiality prior to trial: summary judgment. Goldman has already moved for summary judgment in the court below. *See* District Court Docket, ECF

---

[16] We express no opinion on whether the misstatements at issue here are material.

[17] Defendants may also, as Goldman did here, seek a district court's permission to take an interlocutory appeal from decisions denying motions to dismiss on materiality grounds.

No. 168 (Nov. 6, 2015). One of its arguments is that the alleged misstatements are immaterial as a matter of law. *See id.* at 15–17.

*Third*, even though defendants may not challenge materiality at the Rule 23 stage, they may present evidence to disprove price impact when seeking to rebut the *Basic* presumption. Here, for example, Goldman presented event studies and testimony from multiple experts. The district court found this evidence insufficient—a finding we turn to momentarily. But in appropriate cases, courts will decline to certify classes on this ground.

In sum, while securities class action defendants have numerous avenues for challenging materiality, Rule 23 is not one of them. The inflation-maintenance theory does not discriminate between general and specific misstatements.

**II.    The District Court Did Not Abuse Its Discretion by Holding that Goldman Failed to Rebut the *Basic* Presumption by a Preponderance of the Evidence.**

Goldman's second argument is that the district court abused its discretion in holding that Goldman failed to rebut the *Basic* presumption. To the extent a "ruling on a Rule 23 requirement is supported by a finding of fact, that finding is reviewed under the 'clearly erroneous' standard." *In re Salomon Analyst*

*Metromedia Litig.*, 544 F.3d 474, 480 (2d Cir. 2008), *abrogated on other grounds by Amgen*, 568 U.S. 455.

The plaintiff bears the initial burden of demonstrating that the prerequisites for the *Basic* presumption are met. *Waggoner*, 875 F.3d at 95. The prerequisites a plaintiff must prove prior to class certification are "that [the] defendants' misstatements were publicly known, their shares traded in an efficient market, and [the] plaintiffs purchased the shares at the market price after the misstatements were made but before the truth was revealed." *ATRS I*, 879 F.3d at 481; *see Halliburton II*, 573 U.S. at 268, 276. Goldman conceded in the prior appeal that these prerequisites are met here. *ATRS I*, 879 F.3d at 484.

Once the plaintiff makes this showing, § 10(b)'s reliance requirement is presumptively satisfied. *Waggoner*, 875 F.3d at 95. At that point, the burden shifts to the defendant to rebut the presumption. *Id.* at 101–03. It may do so by showing, by a preponderance of the evidence, that the entire price decline on the corrective-disclosure dates was due to something other than its alleged misstatements. "[M]erely suggesting that another factor *also* contributed to an impact on a security's price does not establish that the fraudulent conduct complained of did

not also impact the price of the security."  *Id.* at 105.[18]  The plaintiff may also, as the shareholders did here, present evidence of price impact to demonstrate the shortcomings of the defendant's rebuttal evidence.  But it bears repeating that to invoke *Basic*, the shareholders need not prove price impact directly.  *See Halliburton II*, 573 U.S. at 277–79.

As outlined above, the district court applied the preponderance standard, credited the shareholders' expert's theory, and rejected the theories of Goldman's experts.  Goldman argues that the court (A) erroneously construed Goldman's rebuttal evidence and (B) misapplied the preponderance standard in holding that Goldman failed to rebut the *Basic* presumption.

---

[18] Although this rule places a heavy burden on defendants, a more relaxed alternative would be illogical under *Basic*.  If a corrective disclosure decreases a defendant's share price on a given date, the plaintiffs have a claim for securities fraud.  That other events may have also decreased the share price on that date does not change this fact; it simply complicates the task of determining the effect of the corrective disclosure by creating a need to isolate it from the effects of the other events.  By presuming reliance when its prerequisites are satisfied, *Basic* places the burden of untangling these events on the defendant.  Thus, for a defendant to erase the inference that the corrective disclosure had price impact—*i.e.*, that it played some role in the price decline—it must demonstrate under the preponderance-of-the-evidence standard, using event studies or other means, that the other events explain the entire price drop.

**A.** **The District Court Did Not Misconstrue Goldman's Evidence in Holding that It Failed to Rebut the *Basic* Presumption.**

Because the *Basic* presumption applies, Goldman bears the burden of rebutting it. It must show by a preponderance of the evidence that the entire price decline on the corrective-disclosure dates was due to something other than the corrective disclosures. *See Waggoner*, 875 F.3d at 105. Goldman challenges the district court's finding that its evidence was insufficient to satisfy this burden.

*1.* Goldman's primary contention is that the district court clearly erred by "ignor[ing] the substance of [the] press reports" preceding the corrective disclosures that touched on its conflicts. Appellant Br. 62. In Goldman's view, the market's nonreaction to these reports proved that it was indifferent to the revelation that Goldman's statements about being conflict free were untrue.

The district court reviewed each of the news reports and concluded by a preponderance of the evidence that "[t]he absence of price movement [on these dates], . . . in and of itself, is not sufficient to sever the link between the first corrective disclosure and the subsequent stock price drop." *In re Goldman*, No. 10 Civ. 3461 (PAC), 2018 WL 3854757, at *4. This was because the disclosures, and particularly the initial Abacus complaint, "included new material information that

had not been described in any of the 36 more generic reports on conflicts." *Id.* This newly revealed "hard evidence of Goldman's client conflicts" included "direct quotes from damning emails . . . [and] internal memoranda," as well as details about "the manner in which Goldman . . . hid[] Paulson's role in asset selection." *Id.* at *4–5. The court also noted that because these details were "disclosed by a federal government agency," they were "obviously . . . more reliable and credible than any of the 36 media reports, especially in the presence of the denials and rebuttals that accompanied some of the reports." *Id.* at *4. The court further found that some of the reports "were not damaging or revelatory, but rather commendatory" praise of Goldman's risk management. *Id.* at *4 n.6.

We find no clear error in the district court's weighing of the evidence. The court applied the correct legal standard and reasonably concluded by a preponderance of the evidence that the corrective disclosures revealed new and material information to the market. Goldman has no persuasive response to the court's findings that the "hard evidence" first revealed in the corrective disclosures moved the market in a way that the news reports did not.

Although it is possible that Goldman's price declined *in part* because the market feared that Goldman would be fined, this is not enough to rebut the *Basic*

presumption. Moreover, there are good reasons to believe that the corrective disclosures were more significant than Goldman makes them out to be. Because the inflation-maintenance theory asks "what would have happened if [the defendant] had spoken *truthfully*," *Vivendi*, 838 F.3d at 258, Goldman's burden is to show that the market would not have reacted had Goldman told the truth about its alleged failure to manage its conflicts. It is difficult to imagine that Goldman's shareholders would have been indifferent had Goldman disclosed its alleged failure to prevent employees from illegally advising clients to buy into CDOs that were built to fail by a hedge fund secretly shorting the investors' positions. It is therefore reasonable to assume that this disclosure would have harmed Goldman's reputation, causing at least some of its clients and potential clients to seriously reconsider trusting Goldman with their money. This lost revenue would have reduced Goldman's bottom line and caused the market to devalue its share price accordingly. These adverse consequences have nothing to do with the threat of enforcement actions, and everything to do with how Goldman managed its conflicts of interest.

**2.** Goldman also argues that the district court did not "address the generality of [the corrective disclosures other than the Abacus complaint]." Appellant Br. at

62–63. In its view, these disclosures were "far less detailed than the press reports of client conflicts." *Id.* at 63.

It is true that the district court focused largely on the Abacus complaint. But so did Goldman. As the court found, Dr. Choi "performed no event study concerning stock price declines following the [other] corrective disclosures." *In re Goldman*, No. 10 Civ. 3461 (PAC), 2018 WL 3854757, at *5. The burden of rebutting the *Basic* presumption was on Goldman, not the district court. The court's finding that the Abacus disclosure had a price impact suffices at this stage for the reasons noted above.

*3.* Finally, Goldman makes a one-paragraph argument that the district court misconstrued Dr. Choi's event study. As noted above, the court found extensive flaws with Dr. Choi's study and gave little weight to his conclusions.

Goldman does not meaningfully engage with the district court's detailed rejection of Dr. Choi's report. Its most substantial argument is that the court erroneously found that Dr. Choi's opinion rested on "the premise that the first price decline is *consistent* with price declines that four other companies previously experienced upon the news of similar enforcement events." *Id.* Goldman argues that Dr. Choi actually concluded that the price declines were "*not statistically*

*significantly different.*"  Appellant Br. 67.  Even if the court mistakenly referred to consistency rather than a lack of statistically significant difference—and elsewhere it used the "statistically different" terminology, *see In re Goldman*, No. 10 Civ. 3461 (PAC), 2018 WL 3854757, at *3—the difference is splitting hairs.  Goldman does not clearly explain how this subtle difference in terminology renders clearly erroneous the court's extensive reasons for rejecting Dr. Choi's conclusions.  Nor do Goldman's remaining arguments point to an abuse of discretion.

## B. The District Court Correctly Applied the Preponderance Standard in Weighing the Evidence of Price Impact.

Although Goldman bears the burden of persuasion, it focuses heavily on the supposed lack of evidence the shareholders introduced to undermine its contention that its statements had no price impact.[19]

*1.* Goldman first contends that the shareholders "submitted no evidence of fraud-induced inflation in Goldman Sachs' stock price that the challenged statements maintained."  Appellant Br. 55.  Thus, Goldman argues, the district

---

[19] That Goldman focuses on the shareholders' evidence, and the district court began its analysis with this evidence, should not obscure the fact that Goldman bears the burden of persuasion at this stage.  Once the shareholders successfully invoke *Basic*, which happened here, the question is not which side has better evidence, but whether the defendant has rebutted the presumption.

court's finding that the shareholders invoked *Basic* rested on *allegations*, rather than evidence. As explained above, we reject Goldman's contention that the shareholders were required to submit evidence of "fraud-induced" inflation. We therefore take Goldman's argument as one that the shareholders failed to submit any evidence of price inflation.

We noted in Part I that "[t]he best way to determine the impact of a false statement is to observe what happens when the truth is finally disclosed and use that to work backward, on the assumption that the lie's positive effect on the share price is equal to the additive inverse of the truth's negative effect." *Vivendi*, 838 F.3d at 255 (quoting *Glickenhaus*, 787 F.3d at 415). This is precisely what the district court did:

> The Court accepts Dr. Finnerty's [the shareholders' expert] opinion that the news of Goldman's conflicts on the . . . corrective disclosure dates negatively impacted Goldman's stock price. It is only natural that "economically significant negative news," such as these, would at least contribute to the stock price declines. Defendants attempt to undermine Dr. Finnerty's opinion, claiming in part that the underlying damages model is "completely made up." That overstates the matter. *Dr. Finnerty's model, at the very least, establishes a link between the news of Goldman's conflicts and the subsequent stock price declines.* That is sufficient.

*In re Goldman*, No. 10 Civ. 3461 (PAC), 2018 WL 3854757, at *4 (emphasis added, citations omitted).

We thus find no merit in Goldman's contention that the district court accepted Dr. Finnerty's model at face value or that it credited mere allegations.[20] The court reviewed the evidence, traced the price declines back to Goldman's alleged misstatements, and credited Dr. Finnerty's report. For Goldman's

---

[20] In critiquing the district court's purported lack of findings, Goldman homes in on the word "allegedly" in the following passage:

> [The shareholders] claim that the alleged misstatements had impact on Goldman's stock price. Although the misstatements themselves did not inflate the stock price, they allegedly served to maintain an already inflated stock price. The inflation was demonstrated on [several] dates, when the falsity of the misstatements was revealed . . . .

*In re Goldman*, No. 10 Civ. 3461 (PAC), 2018 WL 3854757, at *2. This language leads Goldman to conclude that the "[district court] gave no indication that it actually weighed competing evidence or found facts," and instead "accepted at face value [the shareholders'] and their expert's '*alleg[ation]*'" that the challenged statements 'served to maintain an already inflated stock price." Appellant Br. 55 (citation omitted). But Goldman misreads the district court's opinion. The language it quotes unremarkably lacks factual conclusions because it is from an impartial summary of the shareholders' evidence—what one might call the facts section of the opinion. The court saved its conclusions for the analysis section, where, as we have found, it made the necessary findings.

argument to have any force, it would need to show that the court clearly erred by accepting Dr. Finnerty's findings. Goldman has failed to make this showing.[21]

**2.** Goldman also argues that the news of its alleged conflicts could not have caused its share price to decline on the corrective-disclosure dates because its alleged misstatements were "consistent" with the later-revealed fact that it had significant conflicts of interest. Specifically, Goldman contends that statements such as "potential or perceived conflicts could give rise to litigation or enforcement actions," J.A. 5716, "expressly warned" the market that it might have conflicts, meaning the market should not have been surprised to learn that Goldman was in fact conflicted, Appellant Br. 61. This is doubtful. In effect, Goldman is arguing that a reasonable investor would have believed its vague statement was "consistent" with the revelation that it allegedly failed to prevent its employees from colluding with hedge funds to trick investors into buying risky securities. The district court did not abuse its discretion by rejecting that theory.

---

[21] Goldman additionally asserts that Dr. Finnerty's testimony implied that on one date, "*70% of Goldman Sachs' $20.6 billion* market capitalization was 'inflation' maintained by [the alleged misstatements]." Appellant Br. 58. The shareholders accuse Goldman of cherry picking this data point using a date from the height of the financial crisis. We find no clear error in the district court's decision to choose one reasonable interpretation of the evidence over another.

45

Goldman is free to make its merits arguments at summary judgment or trial. The issue here is simply whether the district court abused its discretion by finding that Goldman failed to rebut the *Basic* presumption by a preponderance of the evidence. We find no abuse of discretion in the court's reasonable conclusion that Goldman failed to meet this burden.

### III. The Dissent

Our colleague Judge Sullivan disagrees with our ultimate conclusion. In his view, Goldman and its co-defendants "offered persuasive and uncontradicted evidence that Goldman's share price was unaffected by earlier disclosures of Defendants' alleged conflicts of interest." Dissent Op. at 1. But the issue before us is not whether Judge Sullivan was persuaded; that task fell to Judge Crotty who conducted the hearing, heard the testimony, carefully reviewed all the evidence and analyzed the conclusions of the experts. Unlike Judge Sullivan, Judge Crotty was not persuaded. Judge Crotty was clear in his reasoning and we have reviewed it at length in our opinion through the lenses of clear error, abuse of discretion and Goldman's burden. *See supra* at 15–19, 36–46.

We also disagree with our colleague's characterization that Goldman's evidence was "uncontradicted." Goldman bore the burden of rebutting the *Basic*

presumption. Judge Crotty concluded that Goldman's proffer simply came up short. The shareholders pointed out, through their expert and through comparisons of the news stories on which Goldman tied its fate here, that the conclusions of Goldman's experts were wanting if there were not equivalencies between the news stories and the "corrective disclosures."[22] Judge Crotty agreed with the shareholders; his opinion reflects his reasoning in this regard. The majority opinion reviews that reasoning and finds it to have a firm basis in the facts of the record. Our dissenting friend points to no inaccuracies or misstatements of the evidence to support his view that the district court's conclusions were so clearly erroneous that they require appellate correction. It might well be that were one of us given the same task as that of the district judge we would conclude otherwise; but we cannot say there can only be one conclusion from the record presented.

---

[22] The dissent is quite critical of Judge Crotty's (and our) "failure to engage" with Dr. Choi's analysis. *See* Dissent Op. at 6. Our colleague must have overlooked our description of Judge Crotty's concerns about Dr. Choi's data—Dr. Choi examined only one of three disclosures—and Dr. Choi's employment of factors in his analysis that Dr. Choi himself conceded were not "generally accepted in the field." *In re Goldman*, No. 10 Civ. 3461 (PAC), 2018 WL 3854757, at *5–6. Judge Crotty had other concerns with the value of Dr. Choi's analysis as set forth above. *See supra* at 17–19.

Lastly, our colleague seems exceptionally eager to take on "the generic statements on which [the shareholders'] claims are based." Dissent Op. at 8. His assertion that those statements are too general as a matter of law seems to endorse Goldman's view that price maintenance cases are limited to more specific statements related to performance or corporate expectations. We disagree and have explained why in our opinion.[23]

What the dissent really wants to do is to revisit the question of whether the statements are too general as a matter of law to be deemed material. Judge Sullivan would inject materiality into our Rule 23 analysis in the name of limiting the types of statements that can be considered for price maintenance.[24] The question of whether the statements on which plaintiffs rely were not material as a matter of law will be addressed by the district court at an appropriate time. But

---

[23] *See supra* Section I.B.

[24] The fact is that this argument is just a redux of Goldman's unsuccessful Rule 12(b)(6) argument to dismiss and its motion to reconsider that loss in the district court. "[T]he Court cannot say that Goldman's statements that it complies with the letter and spirit of the law and that its success depends on such compliance, its ability to address 'potential' conflict of interests, and valuing its reputation, would be so obviously unimportant to a reasonable investor." *Richman*, 868 F. Supp. 2d at 280; *see also In re Goldman*, No. 10 Civ. 3461 (PAC) 2014 WL 2815571 at *2–6.

48

for now, the procedural posture of the case and our understanding of binding precedent from this Court and the Supreme Court preclude reaching the matter. If acknowledging that limitation while further recognizing that *some (but perhaps not all)*[25] will view the merits of the shareholders' claim through our colleague's lens is "tiptoeing," *see* Dissent Op. at 8–9, then so be it. Careful footwork is often required in intricate judicial tasks.

## CONCLUSION

We **AFFIRM** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.

---

[25] One wonders if the folks who bought Goldman shares, thinking that Goldman assiduously guarded against conflicts of interests in its dealings with those it advised on financial matters, would be concerned not only with the fines the SEC and DOJ had in mind once specific details of Goldman's fiduciary failures came to light, but also with the financial implications to Goldman's bottom line once those who took Goldman's advice knew it was tainted and had cost them millions or billions of losses in worthless Goldman-endorsed investments. Goldman's specific assertions that it was conflict free might be seen as connected to a decision to buy, or hold on to, Goldman stock. *See supra* at 40–41.

RICHARD J. SULLIVAN, *Circuit Judge*, dissenting:

It is difficult to criticize the majority's cogent and highly logical opinion, except to suggest that it perhaps misses the forest for the trees. In my view, the district court misapplied the *Basic* presumption in its analysis of price impact, essentially turning the presumption on its head. Because Defendants offered persuasive and uncontradicted evidence that Goldman's share price was unaffected by earlier disclosures of Defendants' alleged conflicts of interest – thereby severing the link that undergirds the *Basic* presumption – I would reverse the lower court's ruling and decertify the class.

As an initial matter, I agree with the majority's conclusion in Section I that the district court did not misapply the inflation-maintenance theory of price impact. Whatever the merits or flaws of that theory, it is clearly the law of this circuit and not for this panel to revisit. *See In re Vivendi Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016). Nevertheless, I believe that the majority uncritically accepted the district court's conclusions regarding what rebuttal evidence is necessary to overcome the *Basic* presumption. Though the *Basic* standard is well-established, it bears repeating: "[I]f a plaintiff shows that the defendant's misrepresentation was public and material and that the stock traded in a generally efficient market, he is

entitled to a presumption that the misrepresentation affected the stock price;" moreover, "if the plaintiff also shows that he purchased the stock at the market price during the relevant period, he is entitled to a further presumption that he purchased the stock in reliance on the defendant's representation." *Halliburton Co. v. Erica P. John Fund, Inc.* (*Halliburton II*), 573 U.S. 258, 279 (2014). Once the *Basic* presumption has been invoked, however, a defendant may then rebut it "through '*any showing* that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price.'" *Waggoner v. Barclays PLC*, 875 F.3d 79, 95 (2d Cir. 2017) (emphasis added) (quoting *Halliburton II*, 573 U.S. at 269).

In support of its initial opposition to class certification, Goldman did not dispute that Plaintiffs were able to *invoke* the *Basic* presumption. *See Arkansas Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.* (*ATRS I*), 879 F.3d 474, 484 (2d Cir. 2018). Instead, Goldman argued that it was able to *rebut* the presumption with evidence demonstrating the lack of price impact following earlier disclosures of the alleged conflicts. *Id.* The district court found that Goldman had not rebutted the presumption; we vacated and remanded, directing the district court to "determin[e] whether defendants established by a preponderance of the evidence

2

that the misrepresentations did not in fact affect the market price of Goldman stock." *Id.* at 486.

On remand, the district court held an evidentiary hearing at which Goldman offered the testimony of two experts to demonstrate that the alleged misstatements did not affect the stock price. The first, Dr. Paul Gompers, testified that 36 news reports – including stories on the front pages of *The New York Times* and *The Wall Street Journal* -- had in fact already revealed the supposed falsity of the alleged misrepresentations prior to the three "corrective disclosure" dates, with no discernible impact on the price of Goldman's shares. The second, Dr. Stephen Choi, testified that the stock price declined on the corrective disclosure dates entirely due to the news that the SEC and Department of Justice had commenced *enforcement actions* against the company – not due to the revelation that Goldman had allegedly misrepresented its approach to conflicts of interest, which, as Dr. Gompers demonstrated, had already been revealed to the market. Plaintiffs called one expert, Dr. John Finnerty, to refute Defendants' experts' testimony. Although Dr. Finnerty principally testified that the market for Goldman stock was efficient – a point that Defendants did not dispute – Dr. Finnerty also conclusorily asserted that the 36 earlier news reports did not impact the share price because some of the

reports included "denials" from Goldman, while others were less detailed than the three corrective disclosures alleged in the complaint.

Based on this testimony and the experts' reports, the district court concluded that Goldman had again failed to rebut the *Basic* presumption and certified the class. In particular, the district court relied on Dr. Finnerty's testimony, such as it was, to announce that "[t]he absence of price movement [following the earlier disclosures] . . . is not sufficient to sever the link between the first corrective disclosure [alleged in the complaint] and the subsequent stock price drop." *In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10-cv-3461 (PAC), 2018 WL 3854757, at *4 (S.D.N.Y. Aug. 14, 2018). I disagree.

First, the district court, and Dr. Finnerty, relied primarily on the "efficient market" theory, which alone is insufficient to refute persuasive rebuttal evidence regarding the lack of price impact. As set forth in his January 30, 2015 report, Dr. Finnerty was retained to determine whether Goldman's stock traded in an efficient market – a necessary precursor to Plaintiff's invocation of the *Basic* presumption. But Defendants never disputed the efficiency of the market; they presumed as much. Rather, they presented evidence of 36 earlier news reports that revealed the falsity of the misstatements alleged in the complaint and yet never moved the

4

stock price. They argued, without contradiction, that the lack of movement in the share price – in an efficient market – proved that the later drop was caused by something *other* than the disclosure of the alleged conflicts of interest. Neither Dr. Finnerty nor the district court could refute that conclusion or explain the lack of price movement from the earlier disclosures.[1]

Second, Dr. Finnerty made no serious attempt to refute Dr. Choi's analysis, let alone his conclusion that the stock drop was caused by the announcement of the SEC and DOJ enforcement actions rather than the underlying factual allegations. Instead of differentiating between the price impact of the conflict disclosures and the price impact of the enforcement actions, Dr. Finnerty did his best to conflate them, arguing that the two were inextricably intertwined. In the words of Dr. Finnerty:

> My analysis demonstrates that the description of Goldman's conduct embodied in those three regulatory actions is inextricably tied to the actions themselves. To put it at a very simple level, if you were telling my students what the take-away is, is you can't have a fraud charge without the fraud – without the behavior – and particularly, the SEC

---

[1] Dr. Finnerty's attempt to differentiate the 36 news reports from the three corrective disclosures by saying that the news reports were accompanied by "denials" from Goldman was equally conclusory and unpersuasive, particularly since many of the news reports did not include denials at all. *See* Joint App'x at 5284 –5437; *see also id.* at 3146–96 (Plaintiffs' Summary of News Reports); *id.* at 2951–57 (Defendants' Summary of News Reports).

enforcement action does lay out the behavior that is the basis for the fraud charge.

Joint App'x at 8196. But this failure to engage with Dr. Choi undermined the very purpose of the evidentiary hearing, which was designed to "determin[e] whether defendants established by a preponderance of the evidence that the misrepresentations did not in fact affect the market price of Goldman stock." *ATRS I*, 879 F.3d at 486. Although the district court was at times highly critical of Dr. Choi's studies, it accepted Dr. Finnerty's opinions at face value when it concluded that "[i]t is only natural that economically significant negative news, such as [the conflicts reiterated in the enforcement actions], would at least contribute to the stock price declines." *In re Goldman*, 2018 WL 3854757, at *4 (internal quotation marks omitted). But in addition to being wholly conclusory, that observation was largely beside the point, since it offered no clear explanation for why the market only moved after the 37th recital of fraud allegations.

Of course, the majority correctly notes, as we held in *Waggoner v. Barclays*, that Plaintiffs were not required to prove that news of enforcement actions had no effect on price. 875 F.3d at 104–05. In *Waggoner*, the plaintiffs – who were also proceeding under a price-maintenance theory – invoked the *Basic* presumption, prompting the defendants to argue that the stock price decline "was due to

potential regulatory action and fines, *not* the revelation of any allegedly concealed truth." *Id.* at 104 (internal quotation marks omitted). The district court disagreed, and we affirmed, finding that the "record support[ed] the district court's conclusion that such a concern was merely a contributing factor to the decline." *Id.* In particular, we noted that the defendants' expert conceded that the "corrective disclosure . . . *may* have had a bigger impact on . . . price . . . due to the announcement of the New York Attorney General's lawsuit and that *some* of the price reaction was independent of the specific allegations." *Id.* (alterations and internal quotation marks omitted).

But the key difference between this case and *Waggoner* is that Defendants here have demonstrated that the prior disclosures – as set forth in 36 separate news reports over as many months – had *no* impact on Goldman's stock price. Indeed, as the district court expressly acknowledged, "Dr. Finnerty *concede[d]* that Goldman's stock price did not move on any of the 36 dates on which the falsity of the alleged misstatements was revealed to the public." *In re Goldman*, 2018 WL 3854757, at *4 (emphasis added). Thus, unlike the defendants in *Waggoner*, Goldman introduced hard evidence that "sever[ed] the link between the alleged misrepresentation and . . . the price . . . paid by the plaintiff." *Waggoner*, 875 F.3d

7

at 95 (quoting *Halliburton II*, 573 U.S. at 269). If such evidence can be neutralized by the mere assertion that the SEC's repackaging of those disclosures must have "at least contribute[d] to the stock price declines," *In re Goldman*, 2018 WL 3854757, at *4, then the *Basic* presumption is truly irrebuttable and class certification is all but a certainty in every case.

Finally, I think it's fair for this court to consider the nature of the alleged misstatements in assessing whether and why "the misrepresentations did not in fact affect the market price of Goldman stock." *ATRS I*, 879 F.3d at 486. Although the majority concedes that "[p]rice impact . . . resembles materiality" and may be "disprove[n] . . . at class certification," it then strains to avoid looking at the statements themselves for fear that such a review amounts to "smuggling materiality into Rule 23." Maj. Op. at 29, 30. I disagree.

Candidly, I don't see how a reviewing court can ignore the alleged misrepresentations when assessing price impact. Here, the obvious explanation for why the share price didn't move after 36 separate news stories on the subject of Goldman's conflicts is that no reasonable investor would have attached any significance to the generic statements on which Plaintiffs' claims are based. The majority tiptoes around this fact, noting on the one hand that "courts regularly

8

dismiss securities complaints [at the motion to dismiss stage] because the challenged statements were too general to have induced reliance," while tepidly insisting that "[w]e express no opinion on whether the misstatements at issue here are material," since "[r]ight or wrong, we lack the authority to review [the district court's materiality findings] at this time." *Id.* at 34 & n.16. I don't believe that such rigid compartmentalization is possible, much less required by *Amgen, Halliburton II,* or *ATRS I.* Once a defendant has challenged the *Basic* presumption and put forth evidence demonstrating that the misrepresentation did not affect share price, a reviewing court is free to consider the alleged misrepresentations in order to assess their impact on price. The mere fact that such an inquiry "resembles" an assessment of materiality does not make it improper.

Here, the generic quality of Goldman's alleged misstatements, coupled with the undisputed fact that "Goldman's stock price did not move on any of the 36 dates on which the falsity of the alleged misstatements was revealed to the public," *In re Goldman*, 2018 WL 3854757, at *4, clearly compels the conclusion that the stock drop following the corrective disclosures was attributable to something *other* than the misstatements alleged in the complaint. The most obvious explanation, consistent with Dr. Choi's report, is that the drop was caused by news that the SEC

9

and DOJ were pursuing enforcement actions against Goldman.  But even without Dr. Choi's testimony, the fact remains that Plaintiffs offered no hard evidence, expert or otherwise, to refute Goldman's proof severing the link between the alleged misrepresentation and the price paid by Plaintiffs for Goldman shares.  It therefore seems clear that Defendants "established by a preponderance of the evidence that the misrepresentations did not in fact affect the market price of Goldman stock."  *ATRS I*, 879 F.3d at 486.

Accordingly, I would reverse the finding of the district court with respect to the *Basic* presumption and decertify the class.